UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Louis R. Chatel, Jr.**

   **v.**                                               Case No. 10-cv-576-PB
                                                            Opinion No. 2012 DNH 078

**Lieutenant James Carney et al.**


**MEMORANDUM AND ORDER**

Louis R. Chatel, Jr. was fired in July 2010 after working as an officer for the Weare Police Department for approximately seven years. He brings suit against two Weare police officers, five members of the Weare Board of Selectmen, and the Town of Weare. Chatel claims that defendants are liable under 42 U.S.C. § 1983 for violating his First Amendment rights. He also argues that defendants are liable for various state-law claims, including wrongful discharge, constructive discharge, and violation of New Hampshire's Whistleblower Protection Act, RSA § 275-E.[1] Defendants move for summary judgment. In this Memorandum and Order, I grant defendants' motion with respect to Chatel's federal claim and decline to exercise supplemental jurisdiction over his state law claims.

---

[1] RSA is an abbreviation for New Hampshire Revised Statutes Annotated.

## I.     BACKGROUND

Chatel became a part-time police officer in October 1995 for the Town of New Ipswich, New Hampshire. In October 2000, he was certified as a full time officer. In September 2003, Chatel transferred to the Weare Police Department ("WPD"). In May 2008, he was promoted to sergeant and police prosecutor. Chatel is not an attorney.

### A.    The Brown Report

On October 30, 2009, after an undercover drug investigation overseen by Lieutenant James Carney, two suspects, Dio Brown and London Cohen, were arrested. Chatel alleges that Detective Frank Hebert, an investigating officer on the case, told Chatel to institute a prosecution against both suspects for possession of controlled drugs, possession with intent to sell, transportation of controlled drugs, and forgery.

On November 2, 2009, Brown and Cohen were set to be arraigned. Before proceeding with the arraignment, Chatel met with Hebert and the Weare police chief, Gregory Begin. Chatel informed Hebert and Begin that he did not believe there was a sufficient basis to bring charges against one of the suspects, Brown. Chatel then interviewed both suspects and, based on those interviews, declined to file charges against Brown.

2

After Chatel left the courthouse, he received two phone calls from Carney, who was angry that Chatel had not filed charges against Brown.  Chatel immediately told Begin about the phone calls because he felt threatened by Carney's aggressive language and tone.

On November 4, 2009, two days after Chatel declined to file charges against Brown, Carney ordered Chatel to submit a narrative report regarding Chatel's interviews with both suspects.  The narrative reports were part of Chatel's responsibilities as police prosecutor.  Chatel drafted and submitted his report (the "Brown Report") on that same day.

A few days later, Carney ordered Chatel to alter the Brown Report.  Specifically, Carney ordered Chatel to remove the reference to Chatel having informed Brown that based on what he had been told, Brown would be charged with possession of controlled drugs, possession with intent to sell, transportation of controlled drugs, and forgery.  Chatel initially refused to remove the statement in the report.  Eventually, after Carney threatened to discipline Chatel if he did not remove the statement, Chatel made the requested alteration.

Shortly thereafter, Chatel filed a grievance against Carney, alleging that Carney was creating a "hostile work environment."  The Town retained an attorney, Daniel Schwarz, to

investigate Chatel's allegations. Schwarz issued a report recommending the denial of Chatel's grievance. Begin adopted the report and closed the investigation.[2]

On December 17, 2009, the county attorney asked Chatel to produce the case file for the Cohen and Brown arrests. This was a typical request from the county attorney's office. In preparing the case file, Chatel noticed that the Brown Report had been altered without his knowledge. Specifically, the last line of the report had been deleted, which had read, "[g]iven the above and with the details I was informed of prior to coming to court, I was directed to and did file a notice with the court which stated in part that Mr. Brown was being released without any of the above charges being filed against him." The report showed that it had been modified on November 18, 2009, by "JJC," which were Carney's initials.[3] Chatel, reluctant to send the

---

[2] Although unclear from the pleadings and the parties' briefs, it appears that the standard procedure for WPD grievances is that an aggrieved party submits a grievance to Begin who then determines, based on his own investigation, whether or not to sustain the grievance. In this instance, according to Begin, the Town determined that someone independent from the WPD should investigate the matter. Therefore, although Chatel's other grievances were apparently investigated by Begin himself, this particular grievance was investigated by Schwarz, an independent attorney.

[3] Although Chatel claims that the report was modified by Carney, defendants argue that Begin, not Carney, altered the report. The factual dispute is not material to my decision.

altered report to the county attorney, instead informed Begin of the issue by memorandum, and forwarded two copies of the report to Begin.  The first was Chatel's original report, which contained both the sentence that he had deleted after Carney's threatened disciplinary action and the final sentence of his report that Carney or Begin had deleted without Chatel's knowledge.  The second was the modified report.  Chatel drew a large "X" on the second report.

On January 12, 2010, Carney wrote a memorandum to Chatel requesting an explanation as to why he had submitted a marked up report to Begin.  Chatel responded by memorandum the following day, stating that he "oppose[d] the report that [he] was ordered to change, as it does not accurately portray the facts."  Chatel Mem., Jan. 13, 2010 (Doc. No. 27-6).  Chatel further wrote that, "[i]n the interest of properly and accurately documenting my involvement with the defendants at court, I am reluctant to supply any report that does not accurately, clearly and truthfully reflect all the facts."  Id.

On January 21, 2010, Carney issued a "Letter of Warning" to Chatel for submitting the marked up report to Begin.  The letter cited Chatel for "Conduct Unbecoming an Officer."  Chatel then filed a grievance with Begin regarding the letter of warning.  Begin denied the grievance and Chatel appealed to the Board of

5

Selectmen.  The Board of Selectmen found in favor of Chatel on the appeal and rescinded the letter of warning.

In addition, Chatel contacted the county attorney's office concerning Carney's directive that Chatel modify the Brown Report.  The county attorney referred the case to the New Hampshire Attorney General's ("AG") office.  The AG's office investigated Chatel's allegations and determined that no action was necessary.

### B.     Other Disciplinary Action Against Chatel

#### 1.     Car Accident

On the morning of January 11, 2010, Chatel responded to a multi-car accident in front of a high school.  On the way to the accident scene, Chatel heard a report of a second accident nearby.  Chatel radioed Officer Daniel Aiken, who was on his way to a traffic detail, and instructed him to proceed to the second accident scene.  Aiken reported his location to Carney.  Carney told Aiken to report to his scheduled traffic detail as soon as Chatel arrived at the accident scene.

Once Chatel arrived, he determined that he needed to retain Aiken at one of the accident scenes while he proceeded to the other.  He had another officer radio Carney to request that Aiken remain at the scene.  Carney denied the request and ordered Aiken to report to his scheduled traffic detail.

Later that day, Carney wrote Chatel a memorandum asking why he had contradicted Carney's order to have Aiken report to his scheduled detail as soon as Chatel arrived at the accident scene. Chatel responded by memorandum stating that he did not contradict an order but rather made a judgment that he needed another officer on the accident scene.

On January 21, 2010, the same day that Carney issued a letter of warning to Chatel for marking up the Brown Report, Carney sent him a letter of warning for the incident regarding Aiken and the car accident. The letter of warning cited Chatel for insubordination.

As with the other letter of warning, Chatel filed a grievance with Begin, Begin denied the grievance, and Chatel appealed to the Board of Selectmen. Unlike the other letter of warning, however, the Board of Selectmen sustained Carney's findings and denied Chatel's appeal.

### 2. Child Pornography Case

In February 2010, Chatel was investigating a child pornography case. As part of the investigation, Chatel, using his department-issued laptop, reviewed the allegedly pornographic images at his home. A few days later, Carney expressed concern about Chatel taking home the pornographic images and ordered Chatel not to remove them from the department

7

again.

In April or May of 2010, Begin or Carney contacted the AG's office to prompt an investigation of Chatel for manufacturing and/or possessing child pornography. A criminal investigator from the AG's office contacted Chatel concerning the investigation, and Chatel was interviewed by and cooperated with the office throughout the investigation. On September 28, 2010, the AG's office stated that there was no evidence or basis to support allegations that Chatel illegally possessed, distributed, or manufactured child pornography.

### 3. **Meeting with Jennifer Hodgdon**

On February 3, 2010, Chatel met and had a cup of coffee with an acquaintance, Jennifer Hodgdon. A few weeks later, Carney emailed Chatel to ask about the purpose of the meeting and accused Chatel of meeting with Hodgdon while on duty. Chatel claimed to be off duty during the meeting. On March 1, 2010, Carney issued a "letter of counseling" to Chatel regarding the meeting, warning Chatel to follow appropriate protocols when interacting with civilians while on duty.

### 4. **Hiring of New Police Prosecutor and Chatel's Termination**

On April 22, 2010, Begin informed Chatel that the Board of Selectmen, acting on Begin's recommendation, had hired Catherine

Baumann to serve as the WPD's prosecutor. Begin informed the Board that he thought having an attorney as the police prosecutor would be a benefit to the Town because of his or her legal knowledge. Chatel was reassigned to his duties as a patrolman.

Around this time, Chatel began suffering from severe anxiety. On May 6, 2010, Chatel took paid leave under the Family Medical Leave Act ("FMLA"). On July 29, 2010, counsel for the Town wrote a letter to Chatel's attorney, informing him that Chatel's FMLA leave expired on that date, and that if he was medically unable to return to work, his employment would be immediately terminated. Chatel was unable to return to work and was terminated.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence submitted in support of the motion must be considered in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor. See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).

A party seeking summary judgment must first identify the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996); see Celotex, 477 U.S. at 323.

### III. <u>ANALYSIS</u>

Chatel asserts a First Amendment claim and three state law claims arising from his employment termination.  Defendants move for summary judgment on all claims.  I begin by examining the submitted evidence pertaining to Chatel's First Amendment claim and conclude that defendants are entitled to summary judgment on that claim.  I then briefly explain why I decline to exercise supplemental jurisdiction over Chatel's state law claims.

A.   <u>First Amendment Claim</u>

Chatel claims that defendants are liable under § 1983 for violating his First Amendment rights.  Specifically, Chatel alleges that defendants retaliated against him and terminated him because he initially refused to alter the Brown Report and

submitted the modified report with an "X" marked through it. Defendants argue that Chatel's alleged protected speech was made while he was acting within the scope of his official duties as a public employee, and therefore is not entitled to First Amendment protection.

It is well established that "[g]overnment employers . . . need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).  As such, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."  Id. at 421-22.  Thus, in evaluating the constitutional protections accorded to public employee speech, I must first examine "whether the employee spoke as a citizen on a matter of public concern."  Id. at 418. If so, I must then determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007) (quoting Garcetti, 547 U.S. at 418).

The first element of the Garcetti standard is whether the plaintiff was speaking (1) as a citizen and (2) on a matter of

public concern.[4]  "If the answer to either of these sub-parts is no, then [the plaintiff] has no First Amendment claim based on the Defendants' action in relation to his speech." Foley v. Town of Randolph, 598 F.3d 1, 5 (1st Cir. 2010).  Each instance of speech must be analyzed separately to determine whether it was protected.  See Hennessy v. City of Melrose, 194 F.3d 237, 246-47 (1st Cir. 1999).

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421.  In determining whether a plaintiff made statements pursuant to official duties, the court considers two questions (1) "what are the employee's official responsibilities and (2) was the speech at issue made pursuant to those responsibilities?" Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 26 (1st Cir. 2010).  The inquiry "focus[es] on the duties an employee actually is expected to perform, and not merely those formally listed in the employee's job description." Decotiis v. Whittemore, 635 F.3d 22, 31 (1st Cir. 2011) (internal quotation marks and citation omitted).

---

[4] "The inquiry into the protected status of speech is one of law, not fact." Connick v. Myers, 461 U.S. 138, 148 n.7 (1983); see also Lewis v. City of Boston, 321 F.3d 207, 219 (1st Cir. 2003).

"Ultimately, the proper inquiry is a practical one." Foley, 598 F.3d at 6 (internal quotation marks and citation omitted). Certain categories of speech, however, are considered speech made pursuant to employment duties. These categories include "speech that owes its existence to a public employee's professional responsibilities; speech that the employer has commissioned or created; speech that the employee was paid to make; speech that the employee's duties . . . required him to make; speech that amounts to the employee's work product; and speech that is an official communication." Mercado-Berrios, 611 F.3d at 27 n.9 (internal quotation marks and citations omitted); see also Garcetti, 547 U.S. at 421-23. In addition, the fact that an employee was on duty and in his workplace at the time of the speech, though not determinative, is "relevant and important to the inquiry." Foley, 598 F.3d at 7 & n.9; see also Decotiis, 635 F.3d at 32 (identifying multiple factors that could affect the analysis).

The speech at issue in this case is (1) Chatel's (initial) refusal to alter the Brown Report at Carney's directive and (2) his marking the modified report with an "X" and forwarding it to Begin.[5] Chatel refused to alter the Brown Report while he was on

---

[5] Defendants do not dispute that both of Chatel's actions constitute speech for purposes of this motion. See Welch v.

13

duty as the police prosecutor and working in the police station. In addition, as Chatel concedes, his duties as prosecutor included drafting, editing, and finalizing narrative reports of interviews with suspects. See Chatel Dep. 117:6 – 119:23, Feb. 2, 2012 (Doc. No. 29-1). Although Chatel attempts to draw a distinction between his general duties of editing reports and his refusal to alter the Brown Report, the record evidence demonstrates that Chatel's refusal was directly related to his duties as police prosecutor. See id. at 169:17 ("I considered it unethical for me as a prosecutor [to change the report]."); see also Chatel Mem. (Doc. No. 27-6) ("In the interest of properly and accurately documenting my involvement with the defendants at court, I am reluctant to supply any report that does not accurately, clearly and truthfully reflect all the facts."). Therefore, Chatel's refusal to alter the Brown Report cannot be considered "citizen speech."

Marking the modified Brown Report with an "X" and sending the marked report to Begin were also actions constituting speech made pursuant to Chatel's official duties. Chatel marked and sent the report while he was on duty at the police station. The

---

Ciampa, 542 F.3d 927, 938 (1st Cir. 2008) ("Refusing to speak in the face of an illegitimate request to speak is protected conduct."); see also Riley v. Nat'l Fed. of the Blind of N.C., Inc., 487 U.S. 781, 796-97 (1988).

14

record evidence shows that the county attorney contacted Chatel as police prosecutor and that his responsibilities included maintaining case files and forwarding them to the county attorney's office.  See Chatel Dep. 171:19 – 172:1 (Doc. No. 29-1); see also Compl. ¶ 34 (Doc. No. 1).  As with Chatel's refusal to alter the Brown Report, the record evidence shows that he forwarded a marked up version of the Brown Report to Begin in his role as a prosecutor, not a citizen.  See Chatel Interview of Feb. 9, 2010 at 176 (Doc. No. 24-5) ("[A]s a prosecutor I felt as though it was my duty to say that this is not accurate.").

Chatel does not dispute that his duties as prosecutor include preparing narrative reports and forwarding materials to the county attorney's office.  He argues, however, that his refusal to submit an inaccurate report and his attempt to alert the county attorney's office to the inaccuracy had a "citizen analogue" and is thus protected.  Chatel cites Jackler v. Byrne, 658 F.3d 225 (2d Cir. 2011) in support of his argument.

In Jackler, a civilian filed a complaint against a police officer for the use of excessive force.  Jackler, a probationary police officer, witnessed the incident at issue and, pursuant to department directives, drafted a report, which corroborated the civilian complaint.  Other officers attempted to coerce Jackler

15

into altering his report to cover up for the assaulting officer. Jackler refused to change his report and, as a consequence, suffered various retaliatory actions culminating in his termination. Id. at 231-32.

In holding that Jackler acted as a citizen in refusing to alter his report, the Second Circuit noted that "a citizen who has truthfully reported a crime has the indisputable right to reject pressure from the police to have him rescind his accusation and falsely exculpate the accused." Id. at 241. Thus, the court analogized Jackler to a witness to a crime, and held that his refusal to alter a witness statement had a civilian analogue. Id. at 240 ("Nor does anyone have authority to require a witness to retract his true statements and make statements that are false . . . .").

Here, Chatel was not acting in a way that is analogous to a witness of a crime or any other civilian.[6] Chatel's speech concerned the preparation of case reports and forwarding the reports to the county attorney's office. Chatel does not dispute that those communications are part of the official

---

[6] Even if Jackler were analogous to this case, it is not binding precedent on this court and I would decline to follow it because it is unpersuasive. In addition, other courts have cast doubt on the Second Circuit's analysis in Jackler. See Bowie v. Maddox, 653 F.3d 45, 47-48 (D.C. Cir. 2011).

16

duties of a police prosecutor and are not actions that could be taken by a civilian.  Further, as discussed above, Chatel repeatedly spoke about his actions in reference to his duties as police prosecutor.  See Chatel Interview of Feb. 9, 2010 at 176 (Doc. No. 24-5) ("I have an obligation I believe as a prosecutor to at least let someone know how I feel about this . . . ."). Because Chatel spoke pursuant to official duties and not as a citizen, his speech is not entitled to First Amendment protection.[7]  See Foley, 598 F.3d at 6 ("[W]hen [plaintiff] wrote the internal memorandum at issue in this case, he spoke *as a prosecutor* fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case.") (internal quotation marks and citation omitted).

 Drawing all reasonable inferences in Chatel's favor, the record evidence shows that Chatel was acting pursuant to his

---

[7] Although Chatel submitted an affidavit with his objection stating that he spoke as a citizen and not as a police prosecutor, an affidavit that conflicts with a party's sworn testimony is not sufficient to create a genuine issue of material fact.  See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."); see also Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994).

official duties, and not as a citizen, during both instances of speech. Because I find that Chatel was not speaking as a citizen, I do not need to consider whether he was speaking on a matter of public concern or defendants' justification for their treatment of Chatel.

**B.   State Law Claims**

Having disposed of the federal law claim in this action, I decline to exercise supplemental jurisdiction over the remaining state law claims. See 28 U.S.C. § 1367(c)(3); see also Camelio v. Am. Fed'n, 137 F.3d 666, 672 (1st Cir. 1998) (district court may decline jurisdiction after dismissing all claims over which it has original jurisdiction). Accordingly, I dismiss Chatel's state law claims without prejudice to his right to pursue them in state court.

## IV.   CONCLUSION

For the aforementioned reasons, I grant defendants' motion for summary judgment (Doc. No. 24) on the First Amendment claim. I decline to exercise supplemental jurisdiction over the state law claims. These claims are dismissed without prejudice. The clerk shall enter judgment accordingly and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

April 26, 2012

cc: George T. Campbell, III, Esq.
    Mark T. Broth, Esq.